This ruling is 26-1033, ParkRevision v. Qualcomm. Mr. Budwin, whenever you're ready. Thank you, Your Honor. Josh Budwin of McCool Smith on behalf of ParkRevision. This Court's September 6, 2024, precedential opinion was correct in every respect. Yet on remand, the District Court failed to apply this Court's direction and committed error by reading the generating limitation into the receiver claims at issue here. Can we talk about Rule 54B? Yes, Your Honor. I'm not aware of a prior 54B where some patent claims that have been finally adjudicated could come up on appeal under a 54B while other patent claims were still being litigated below. Is there an example of that? Your Honor, we were unable to find such an example. I would agree with the framing that this is unprecedented, but the procedural posture of this case is also unprecedented, and it meets all of the requirements for certification pursuant to Rule 54B, which is dictated to the discretion of the District Court, which the District Court correctly resolved in this case, Your Honor. Speaking of standard of review, we've got a case, W.L. Gore, and doesn't it say that an appellate court should review the finality of a judgment de novo in order to assure itself it has jurisdiction? The underlying factors in 54B may be at the discretion of the judge, but isn't the threshold issue a de novo standard of review? Ultimately, whether the issues are properly before the court, this is an appellate court that decides the issues that are properly before it, Your Honor. And at least with respect to the 907 patent that's at issue here, where the District Court's order was dispositive as to all claims related to that patent, there can be no doubt that the issues related to the 907 patent are properly before this court. But we've never had that situation either, where, say, the claims of one patent have been resolved below, but the claims of a second asserted patent are still being litigated. Well, not in the Rule 54B context, Your Honor, but it's certainly permissible under Interlocutory Appeal 1292B. And to the extent that this Court is at all uncomfortable with considering this case under the Rule 54B, this Court is permitted to convert the District Court's Rule 54B certification into a Rule 1292B Interlocutory Appeal and consider the issues under that framework, Your Honor. Why would we do that? I mean, that's such a rare procedure that's used by our court. I mean, we've got hundreds and hundreds of cases, and the minute we open up one little hole, people can try to drive a truck through it. Why would we do that in the circumstances of this case? This is a very unique case, Your Honor. Well, I know it's very old. It's old, and as referred to on the first page of the Court's 2024 opinion, it refers to this as a litigation saga. And as the District Court recognized when it granted the Rule 54, this is an unusual, rare, and unique case, which meets the requirements for certification under Rule 54B. And there can be no doubt that further delay would work hardship and injustice, which is what that Rule 54B, also potentially 1292B Interlocutory Certification, is permitted to address. This case has been pending, as you know, well longer than a decade, has been to this court already twice, three times if we include the PTAB appeal of the 940 IPR. I know, and it's unfortunate because the briefs here were filed. I mean, now we've built in another year, a year and a half into the delay because of this appeal. That's an unfortunate circumstance, but I don't see how that gets you to the extraordinary circumstance, which no one can find any precedent for compared to a 54B here. Which is also why we requested to expedite this appeal, Your Honor. This case, coming back to why Rule 54B and 1292B exist, I agree. They are rare. They are unique. It's not something that's going to be granted in every case, even the vast majority of cases. This is a case where it's proper. We've got an inventor who's died. Our first expert received an adverse health event and had to withdraw. Now, during the pendency of the remand, our second expert was diagnosed with... First of all, very little of that distinguishes you, sadly, from dozens of other patent cases, for better or worse. But fundamentally, I'm having trouble still, even if 54B were appropriate, what's the prejudice of going to trial or finishing up what's remaining, these transmitter claims, and then coming to us with one final appeal? So it's not just the additional delay, Your Honor. It's how long this case has been pending. If we go back to... Well, we can't turn back the clock. Why? I mean, why? Again, what is the prejudice? Because the district court found some, and you keep arguing it, but why not just finish up like almost every other case does on the transmitter claims, and then come here and make your arguments that the claim construction was wrong on the receiver? Yes, Your Honor. And if we want to handicap how much longer that will take, I mean, I have a district court case now where we're more than a year post-jury trial, and we still don't have a final judgment. Is there a possibility of a pending summary judgment motion in this case on the claims? On which claims, Your Honor? The transmitter claims? Yes. I don't believe so. I believe all of the summary judgment motions have been decided. I think there are pending issues. There's still a Dalbert issue outstanding, motion to eliminate, things of that nature. The issue we have is we're losing the witnesses and the people who were involved in this case. One of our inventors has died. We've now lost our second expert. Some of the Qualcomm witnesses who were involved in the transactions that we say lead to induced infringement and willful infringement, they've also died. I understand some of them are no longer, they have adverse health instances and may be unable to testify live at trial. And so if this case takes another two, three, four years to resolve, we're going to continue to lose evidence, which the 16-year saga of this case, going back to Parker Vision 1, shows. So the only things before us are those claim constructions, right? Claim construction and the request for reassignment, Your Honor. To the extent you argue that maybe one thing we should do for you is consider just the 907 patent because it is final, I'm concerned about that because you never requested just a 907 appeal and it seems to me the logic of your position is we could, the district court couldn't find there's no just reason for delay of an appeal of just the 907 because of the at least arguable overlap on the issues between the 907 and the 940. So I'm troubled by considering telling the district court it got the 54B wrong on a question it was never asked, that is 907 alone. But even if we could do that, wouldn't it be wrong to say there's no just reason for delay of just a pure 907 appeal? Yeah, Your Honor. We asked the district court to certify the 907 and the related 940 issues because they present the same claim construction issues. But you never asked just 907, correct? Yes. And if we want to fall back to saying what should be heard is just the 907, which I believe is properly before this court because it's dispositive as to all issues, this court could consider the 940 issues pursuant to pendant jurisdiction, which we explain in our briefs. It's the same claim construction issue with the same underlying facts and law. So the court could consider it that way. If the court has any concerns about how this case is presented and how this case is before the court today, the court could issue a limited remand to the district court with a direction or an instruction to certify just the 907 patent, potentially under 54B or 1292B or both patents under 1292B. There is a reason Rule 54B exists. There's a reason Rule 1292B exists. It is set to be the exception, and here we meet that exception as the district court found in its discretion. And I would note that under this court's authority, the 2001 decision of Intergraph, which is cited on our blue brief at page 4, whether an appeal should proceed under Rule 54B is best decided by the trial court and should only be disturbed where clearly unreasonable. But I think that goes to the no just reason for delay discretionary part. Whether there's finality here is, as Judge Gross mentioned, something we review de novo, and I don't think you're arguing that district court can treat something as final that as a matter of law is not final. I would not make that argument, Your Honor. The district court has treated these issues as final. It gave us a final judgment on the receiver claims in the 907 patent. But if, unfortunately, that's an error of law, that you cannot split up a single cause of action and treat half of that cause of action as a final judgment for 54B, then we have to say that and send you back, right? Correct. Unless this court either converts it to a Rule 1292B, which it's permitted to do, or has a limited remand where it directs the district court to do so. Well, I guess just confirm this for me. As I understand it, I think I'm looking at it, but at A576, it's your complaint. Count 1, infringement of the 940 patent. That count 1 is not final, correct? Count 1 in the pleading, the notice pleading, is specific to the patent. The infringement allegations are specific to the claims, and each claim stands on its own, Your Honor. But your count 1 cause of action is not final. Half of it, roughly half of it, is severed and stayed and still in the district court, correct? Severed into a separate cause of action and stayed, those claims. So what the district court did was it was specific as to the claims at issue. The receiver claims were entered final judgment, certified for appeal, pursuant to Rule 54B. The remaining transmitter claims were severed into a separate cause of action and stayed. And that's where the procedure is now at the district court level, Your Honor. Could you explain something to me about Claim 24 of the 940 patent? The party seemed to be calling it a receiver claim, but half of that claim is really contained in independent Claim 22, which is all about a transmitter subsystem. And so Claim 24 is really a transmitter and a receiver claim. Claim 22 is a transmitter claim. The last element of that is a generic recitation of a receiver, of which Claim 24 then specifies the specific elements of that receiver. And so you're calling Claim 24 a receiver claim, but Claim 24 necessarily has brought in a transmitter, a significant transmitter component into Claim 24. Ultimately, to prove infringement, we would have to show the elements of the independent claim. That independent claim is not separately asserted and is not what any of the parties or this Court have referred to as a transmitter claim at any point in the pendency. I understand they haven't labeled it a transmitter claim, but you just look at Claim 22, which is necessarily part of Claim 24, and you line it up to Claim 25 of the 940, which is one of the transmitter claims, and Claim 25 and Claim 22 really look very similar in what they're talking about. The difference is that Claim 24 is claiming the receiving subsystem, which is not present in either of the claims that Your Honor just mentioned. Right, but Claim 22 is necessarily part of Claim 24. We can't ignore all the elements of Claim 22 when we're examining the scope of Claim 24. Claim 24 is a dependent claim, Your Honor. That's correct. And so I think you assert, I'm not sure, that the damages are completely separate and distinct between the receiver and the transmitter claims, and I have a hard time looking through all the claims and seeing how that's the case. There are separate damages numbers presented for receiver and transmitter and the damages expert reports, which are still subject to the district court's down there. And that's part of what supports the separateness of the claims, because they have separate recovery in addition to separate infringement proof. But I assume for Claim 24, for the accused products, you're pointing to something in Qualcomm's products that would meet the receiver limitations, and then something else in the Qualcomm accused products that would be matched up with the transmitter portions? In order to prove infringement of Claim 22, even though Claim 22 is not separately asserted, first we would have to prove that the elements of the independent claim are met, which relates to transmitter proof. Yes, that's correct, Your Honor. Then we would have to prove that the receiver claim is 24. So then there is transmitter proof required to deal with this receiver claim of 24. But the damages recovery is separate, Your Honor. There's no claim under Claim 24 for transmitter damages. It's specific to only receiver. In Qualcomm's accused product, are you accusing one component in Qualcomm's product as being a transmitter and then another separate component as being a receiver? Yes. Or are you accusing a transceiver as being the infringing component? When we look at a chip, the accused products, most of which are transceivers, there's one piece of silicon. Within that piece of silicon are separate components. Some of those are transmitter, which is up-converting the signal for transmission, and that's separate from the receiver claims, which is receiving the high-frequency signal and down-converting that. So they are separate. They're separate circuit elements. They're drawn separately on the schematics. And the way we intend to prove infringement of them is different, because it's different infringement proof for each. And the damages would be you're dealing with sales of a device, or how do you differentiate them when you're dealing with the amounts collected for one versus the other one? Correct, Your Honor, because we have to apportion to the infringing instrumentality. And so we've apportioned and arrived at a number for receiver, and we've apportioned and arrived at a separate number for transceiver. And so the damages are separate, and there's a separate apportionment for each. And you mentioned there's a Daubert challenge pending. Does that have to do with any of the things we've discussed today? There's an outstanding Daubert challenge on the damages, and my recollection of it is that challenges the whole gambit of the damages report that we've provided in this case. Near the start of your remarks, you said, I think, that the district court didn't comply with what we ordered in our last opinion. I understand what I'll call substance, the substance of the claim construction you're unhappy with, but I'm more concerned at the moment about procedure. Is there something procedural that the district court did that you think did not comply or was inconsistent with what we were ordering procedurally to happen on remand? Yes, Your Honor. So the remand instruction was clear that on remand, the district court should undertake any necessary claim construction and then determine whether the asserted claims that issue receiver claims have the generating limitation of the claims that were issued. It seems like that's exactly what happened. The district court understood that was its task, but then, and in this court's 2024 opinion, it identified two errors. The first error was ignoring or failing to apply the intrinsic evidence, which the district court again repeated. The district court's claim constructions are not supported by the intrinsic evidence, and they render the claims as written nonsensical. So I should have said, you may have an argument that the claim construction process he followed was somehow inconsistent with a proper claim construction process. In my mind, I'm thinking of that just for purposes of this question as substantive, because I know you don't like the claim construction. But we remanded with directions to undertake further claim construction if necessary. And while I understand initially maybe the district court thought none was necessary, ultimately on reconsideration, he agreed some was necessary and he went through a claim construction process. Do you agree with that part, that that is what happened, and is there some other procedural error that happened? I agree with that, that the district court went through the claim construction process. I disagree that the district court followed the claim construction process that this court guided it to in its 2024 opinion. Thank you. Can I ask a couple questions about the merits of the claim constructions below? I know we're way out of time, but I think counsel is eager to get to that. Isn't it true that your inventors and your experts acknowledge that these two claims in front of us, they're using the energy stored in the storage medium to produce a down-converted signal? Absolutely not, Your Honor. The inventor testimony that's referred to was in specific, I believe, to the 551 patent, which was at issue in Parker Vision 1. And as this court's 2024 opinion expressed, and this is the second error that I was explaining to Judge Stark, the district court erred in 2024 by treating the extrinsic evidence, the expert opinions, as unrebutted, when in fact it was undisputable that the explanation our expert provided, which is inconsistent with the formulation Your Honor just provided, was inconsistent with viewing the claims in that manner. And so our expert's explanation is in the record at Appendix 9058 to 59, cited on pages 10 to 12 of our blue brief. And that's credited in the 2024 opinion, the quote in the 2024 opinion. I'm referring to A7379, this is Dr. Stier, and then A7237, and that's Dr. Allen. And they both seem pretty clear that when it comes to the 940, that energy that's being stored in the storage medium is being used to produce that low-frequency baseband signal. It's used to produce a continuous down-converted signal. It is not used to create the down-converted signal in the first instance. And that... Absolutely, Your Honor. This is a sampling system, and so the way a sampler works is the switch in the sampler opens and closes and takes discrete samples of the input high-frequency signal. Those samples, when they're taken, those signal portions are the down-converted, performing the down-conversion. The down-conversion is performed in the switch, not in the energy storage device. And trying to read the claims, particularly these claims in a way, saying that it's the energy storage device that's doing the down-conversion... Those stored samples, those portions, to combine them with other portions to produce the final down-converted signal. And I thought when we read Parker Vision 1, that was the whole key to the generating limitation. So the first part of your framing I agree with. The second part, referring to Parker Vision 1, I disagree with, Your Honor. And so the way the claims, particularly these claims are written, is clear. Energy is sampled by the switch. That is the down-conversion. The down-conversion happens at the switch. Those create signal portions. Some of those signal portions go directly to the load, never even go into the energy storage device. If we look at Claim 1 of the 907 patent, the third step of that is clear. It says, providing during the periodic couplings, energy from the electromagnetic signal to the load. That energy never goes into the energy storage device. Meaning, that energy, if the rest of the energy that does go into the energy storage device, and the energy storage device is doing the down-converting at the load, you're going to have a high frequency energy that you're going to try to combine with already down-converted energy, and that's not possible. Instead, what happens, and as our expert explains in the appendix, 9058-59, cited in our blue brief, pages 10-12, the switch in the energy sampler takes samples. Those samples, those signal portions, are then ultimately combined in the load to create a continuous down-converted signal. That's exactly what's shown in figure 57E. It's the sawtooth waveform, appendix 2-11, blue brief page 49. Signal portion 5710A, that's the portion of the signal that's created when the switch is closed, and the high frequency signal is coupled directly to the load. You get this rising edge on that sawtooth waveform, and then when the switch is open, the energy that was already down-converted by the switch, and that is stored in the energy storage device, is then provided to the load to create this continuous down-converted signal. When Parker Vision 1, at 10-13, defines the generating limitation as requiring that the accused product produce a low-frequency baseband signal using energy that has been transferred from a high-frequency carrier signal into a storage medium such as a capacitor or a set of capacitors, why isn't that what is essentially happening here when you combine up what's being stored in the capacitors or storage mediums in these claims? Here's the distinction, and the 2024 opinion recognizes this expressly. The 2024 opinion says at or after the capacitor, with emphasis, six times, and that is the key. In Parker Vision 1, that generating limitation came at the very end of the claim, after the energy storage device, and was read to require the creation of the low-frequency down-converted signal in the first instance at or after the capacitor, as the 2024 opinion recognizes, six times. In contrast... But the 2024 opinion could not have changed the meaning of what a generating limitation was described in the 2015 opinion, could it? No, it's not. It's saying... I'll read it to you. This is the quote from the 2024 opinion. In Parker Vision 1, we concluded that the generating limitation in each of the claims asserted in the 2011 action, quote, requires that the accused products produce a low-frequency baseband signal using energy that has been transferred from a high-frequency carrier signal into a storage medium such as a capacitor or set of capacitors. This meant that the down-conversion of the signal had to occur at or after the capacitor. That is exactly right. The reason we lost in Parker Vision 1 is because those claims were read to requiring generating of the low-frequency signal in the first instance at or after the capacitor. It is impossible to read these claims to have that same requirement. The 940 claim is express, step one, the UFT module to down-convert. What if the this-meant sentence about down-conversion is shorthand for what the prior sentence from Parker Vision 1 says, which is the production of a low-frequency down-converter baseband signal using energy that was stored in the capacitor? Your Honor, if there was any doubt, there's another portion of the 2024 opinion that I'll refer you to. Oh, yeah, I know. I've read them all. There's a that is and other words, but I guess we need to understand what has been said in Parker Vision 2 in light of Parker Vision 1. I guess that's what I'm trying to get at. As the 2024 opinion says, none of the asserted receiver claims in this case appears to require the down-conversion to occur at or after the capacitor. Instead, the claims involved here appear to permit the down-conversion to occur before, and there's emphasis on the before, before the capacitor. And that is exactly right, Your Honor. The claims here do permit the down-conversion to occur before the capacitor because it is the switch that is doing the down-conversion. And all this Court needs to do is look at the claim language themselves to arrive at that conclusion. Unlike, unlike, is that it? Yes, that's it. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. Your Honors are exactly right that there is a threshold jurisdictional issue here, and what Parker Vision is seeking is unprecedented. And that's because there's no basis for it. I will address some of the jurisdictional issues, and then since there was some discussion of the merits, I'll turn to that. We should start with Rule 54B, which is, of course, the Rule of Civil Procedure 54B. That is the context in which we're operating here. And Rule 54B has a mandatory statutory requirement of a final judgment. That's clear. It's reiterated in Curtis Wright, W.L. Gore, elsewhere. We don't have that here. I think you appreciate that we all get what you're saying. Yes. I understand it. But just on the ground, as a practical matter, is there anything, I mean, is your friend incorrect that these claims are absolutely separate and distinct with respect to damages and everything else, and therefore there's no policy reason, there's no practical reason that they couldn't be taken up? Forget 54B, necessarily. And just the practical problem, the reason we have 54B is for some sort of slim exception. And why, at least with respect to the explicit separateness of these particular claims, does it not maybe fit within that very, very slim exception? Thank you, Your Honor. My friend is absolutely incorrect that it would be possible to sever them in some way. As Judge Chen was observing, Claim 24 here of the 940 actually depends from Claim 22, which is effectively a transmitter claim, although, yes, no longer asserted. And it is very similar to one of the remaining claims, 25. They even have elements in common, plurality of harmonics and the like. And since the Court seems to be interested in prudential considerations, I would note that, for example, although this is not necessarily an issue here, what would happen if there were inequitable conduct? Let's imagine that remaining severed claims are tried below inequitable conduct is proven, and then an entire patent is supposed to be canceled. This would create a procedural mess. What about the fact that the transmitter claims, as I understand, are now severed and in their own cause of action? Does that make a difference? Thank you, Your Honor. I was curious to hear about that because I, myself, am not familiar with the separate cause of action language and formulation specifically. I have been looking at Appendix 6, in which the district court purported to enter final judgment pursuant to Rule 54 on the receiver claims. Again, we maintain that was defective. And then right after, it says all other claims are severed and stayed. I see no discussion of another cause of action per se. Let's look at it this way. What if they had, from the beginning, pled cause of action count 1 is 940 receiver claims, cause of action count 2 is 940 transmitter claims? We would have a final judgment on count 1 in my hypothetical. Would that be meaningfully different for 54B purposes? It would be meaningfully different for Rule 54B purposes, Your Honor, but what's interesting about that is they couldn't have done that because it's axiomatic that you need to plead infringement for a patent, not for particular claims within a patent. You say axiomatic. Do we have cases that say that? We do, and they're cited in our briefs, and I'd be happy to pull them up. But it's the ones in the brief? Yes, Your Honor. So if, for example, the 940 was only for transmitter claims and the 907 was only for receiver claims, then it would be fine to do a 54B on the 907 with just the receiver claims? Your Honor, I think in that situation there would be very different just reason for delay concerns, and the district court would have to analyze it differently. But the finality part? The finality part would be that we're dealing with claims within a patent, but between one patent and another patent are there 54B cases? I believe there are, Your Honor. Because we are talking, however, about how this is unprecedented, I do want to note the parties agree that the case that is most on point is Donnelly. And although Donnelly is non-precedential, we know it's non-precedential, but it is persuasive to this court, and it bears noting exactly what Donnelly says, which is, and this is at page 3, quote, the term claim as used in Rule 54B refers, of course, to a claim and a cause of action, not to individual patent claims, close quote. It's clear, and there is, of course, lots of other authority to which we cite in our brief, establishing that a claim, that word in the context of civil procedure, means a cause of action. Should we be looking at 11th Circuit law here, or our own? Your Honor. So is a cause of action really patent by patent, in your view? Yes. Cause of action is patent by patent. That's correct. What if there's two patents that are granted off the same common specification, and the claims are in different patents, but they're claiming very, very close cousins of each other? So in that situation, the district court, who was looking at the Rule 54B certification request, would analyze the just reasons for delay and conclude that those should not be separated. So it goes to the second prong of the Rule 54B analysis, and not the first prong, which is the final judgment requirement. What about a patent that is, I don't know, has a 1,000 page specification, and it has wildly different embodiments being described in the 1,000 page specification, and then there are claims in a single patent that are directed to those wildly different embodiments. Would we still say it's a patent by patent cause of action analysis? Yes. Even if there's one claim to, I don't know, a new transmission system, and another claim to a braking system for a car? Yes, Your Honor, you would. It would remain patent by patent cause of action, and the Donnelly Court actually addressed that. They couldn't imagine, but I've got a pretty good imagination. So I am just wondering if 54B is supposed to be pragmatic or functional, and we're really talking about claims that are wildly unlike each other, then why would we say that no, they're all lumped in the same cause of action? Because then it starts to feel like form over substance. Right. So Rule 54B is pragmatic, but it is supposed to be extraordinarily rare, and we do, of course, have a statutory requirement that is clear on the face of the language of Rule 54B, and the Supreme Court has repeated that those requirements need to be met. In another context here, which hopefully we can get to because I did hear Mr. Defective Rule 54B certification into 1292B jurisdiction. And as the Supreme Court has told us, when the statutory requirements are not met, it would twist the fabric of the statute more than it can bear. We are, of course, talking about jurisdiction, and there are bright-line rules. They argued, it's in their very brief at 8, I'm sure you're familiar with it, that your jurisdictional challenge goes only to the 940 patent. And you heard them again today say the 907 is definitely final, and maybe we should consider just reviewing the 907. Is it true that your jurisdictional challenge only goes to the 940 patent? And either way, why shouldn't we at least entertain the merits of the 907 issues? That is absolutely not true, Your Honor. The entire Rule 54B certification was defective. And the reason why it would be improper for the court to consider the 907 alone is because, again, Rule 54B has these express requirements, and the district court must determine that there's no just reason for delay. Here, Parker Vision never asked for a 907-only appeal. There would be very different just reasons for delay. We never had an opportunity to respond to that. The district court didn't say anything about it. And I would also direct the court to Curtis Wright, which reiterates that requirement of Rule 54B. Do you have any response, putting aside 54B, the arguments that this case is just so unusual and now so old, has been here so many times, sadly people are getting older, maybe passing away, that if there's any possible way we could find jurisdiction and find an exception here, we really should do it because of unique characteristics about this case? Thank you for raising that, Your Honor. It is an ironic argument because if there had not been a Rule 54B certification, perhaps there would have been a trial on the transmitter claims already, and maybe we would be back up here again on an expedited appeal of all the issues as things are normally considered. There's nothing particularly exceptional here that merits finding jurisdiction, and there just is no jurisdiction. If I may, I also heard my friend Mr. Budwin discuss pendant jurisdiction, and I just wanted to clarify there that even if the court could exercise jurisdiction over the 907 alone, it would be improper to try and extend that to the 940. And that is because the 907 and 940 constructions are not inextricably intertwined, lots of inextricable intertwinement today, and furthermore, review of the 940 is not necessary to ensure meaningful review of the 907. And those are the tests as originally set forth in Swint and as repeated by this court in Helafix and Orenshin, which are cited in the papers. And the Helafix case, to which Parker Vision cites, actually just underscores the point. There, the court exercised pendant jurisdiction because it clearly had jurisdiction over the denial of a motion for a preliminary injunction. And it exercised pendant jurisdiction because that was based upon a summary judgment of invalidity. So they were inextricably intertwined, and it was necessary to review both. That is not the situation that we have here. I would love to. Thank you, Your Honor. In short, Parker Vision is misrepresenting what the core invention is here. And I would like to start with the 907 patent. And we can start with the plain language and the structure of the claim. So you have all the limitations, and at the very end is when you first see the down-converted signal being recited. And as we can see, if we go to Figure 65, which is one embodiment of it, you can see how this works. Here in Figure 65, we have the electromagnetic signal coming in, the down-converted signal going out. And they are going in and out of the gated transfer module. Both the switch module and the storage module play a part in that down-conversion. And they cooperate. And that is the language of the specification. When you view the claims in the context of the patent instrument as a whole, it is crystal clear that it is the energy transfer, both energy transferred, yes, from, in the 940, the UFT module, but also from the storage device that generate the down-converted signal. I can direct the court to lots of other places that make this point, but one final note on the 907, the specification uses forms synonymously with generates, or produces, creates. So Figure 83D is an example of that. That is at Appendix 265. And the specification explains that 83D illustrates down-converted signal, 8310, that is formed by energy transfer. That would happen at a different point. And finally, lest there be any doubt, also the 907 patent Appendix 394, the specification teaches, starting at line 5, that the storage module outputs the transferred energy as the down-converted signal. There's certainly specification support for what you're saying, but why, if we were to reach the merits, why would the claims be limited just to embodiments that do the down-converting at the place where you say and point out there is support for it? Why would that be the full scope of these claims, though? Because these constructions, the courts' constructions, did not limit to particular embodiments. Rather, they clarified a slightly uncertain term in the claim language. And when you read the specifications and you look at the figures as a whole, there's discussion throughout in lots of different embodiments that talk about how the storage module plays a role. So, for example, we were just talking about the gated transfer system. The specification also talks about the inverted gated transfer system. That's column 103 on the next page. We didn't cite that in our papers, but the specification is replete with it. I would note, just briefly addressing the 940, since I hadn't yet addressed it, what Parker Vision is essentially trying to do here is ask the court to adopt tunnel vision. So if you look at the 940 figure 64A, you can see that it is the aliasing module that is doing the down-conversion. And again, you have the UFT module, yes, but you also have the storage device. That is what is down-converting. I know that I'm over my time. You're aware there's a request for reassignment. I just wanted to ask you to address one part of what Parker Vision argues at page 26 of the gray brief. They say Qualcomm ignores the judge's criticism of this court and his criticism of our direction to reopen claim construction. I didn't see you address that. Is that at all relevant if we were to consider reassignment, his arguable criticism of us and our opinion? We certainly tried to address it on some level, Your Honor. Apologies if we didn't enough. Reassignment is an extraordinary and severe remedy, of course. And we cited case law in our brief about how jurists dealing with long-standing complicated cases may express frustration, dissatisfaction, even anger. But that doesn't amount to grounds for recusal or reassignment. There's no dispute here that the Torkington factors apply. All three of those factors in this case weigh heavily against reassignment. So there's no appearance of partiality. We're here arguing before Your Honors today because the district court ruled against us and for Parker Vision in certifying this appeal. And finally, there would be extraordinary waste and duplication if this were to go to another district court judge at this point in time. Thank you. Thank you, Your Honors. Your time's all gone. Thank you, Your Honor. I just wanted to come back to the jurisdictional questions and say that I agree with what Judge Chen said. The law calls for a practical finality standard, not a rigid standard. And that's why Rule 54B and Rule 1292B exist. They exist for the exceptions, not for every run-of-the-mill case. And we look at the factors. What are the separateness of the rights? Here there's a clear separation and a division between receiver and transmitter. And consistent with what Morris Federal Practice says, because there is separate recovery available, those are separate claims within the meaning of Rule 54B. There's no, that's Morris of claim in the law, which is why the standard needs to be practical. I want to come back to the merits of the claim construction issue briefly. There is no way to read the generating limitation into the claims where the district court did without rendering the claims nonsensical. That's true for both the 940 claim, where Step 1 is clear. The UFT module, not anything broader than that, the aliasing module I heard my friend refer to. The UFT module to down convert, Step 1. That's Figure 64A. There's a box drawn around the UFT module, 6402. The only things within that box are the switch and the control signal for that switch. The storage module is not within that box. When we look to Claim 1 of the 907 patent, the step that I read, providing during the periodic couplings energy from the electromagnetic signal to the load. That energy goes straight from the high frequency input signal and it bypasses the energy storage device and goes to the load. If that energy that never goes in the energy storage device is being down converted by the switch, as we say, then it makes sense. All of the switch portions are combined in the load. Otherwise it's nonsensical because you have high frequency signals and low frequency signals being combined in the load. Thank you.